IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| MARLENE CORTEZ SNELLER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:11-CV-261 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION
## TO AFFIRM DECISION OF THE COMMISSIONER

Plaintiff MARLENE CORTEZ SNELLER brings this cause of action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting

Commissioner of Social Security, denying plaintiff's application for disability insurance benefits.

For the reasons set forth below, the undersigned United States Magistrate Judge recommends the

Commissioner's decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
BACKGROUND

Plaintiff applied for disability insurance benefits in April 2008.  (Transcript [hereinafter Tr.]

108).  Plaintiff alleges she has been unable to work since December 1, 2007, due to back and neck

problems, hepatitis C, and arthritis.  (*Id.* at 113).  The Social Security Administration, finding

plaintiff suffers from non-disabling major depressive disorder and degenerative back problems,

denied benefits initially and upon reconsideration.  (*Id.* 47, 48).

Upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ) on

January 21, 2010.  (*Id.* 34).  The ALJ determined plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (*Id.* 20).  At the time of the administrative hearing, plaintiff was forty-seven years old and had obtained a two-year associate's degree in horticulture.  (*Id.* 37, 316, 375).  Plaintiff's past employment included working as a cashier, meat trimmer, and cook's helper.  (*Id.* 42, 89, 114).

On February 19, 2010, the ALJ rendered an unfavorable decision, finding plaintiff not disabled and not entitled to benefits at any time relevant to the decision.  (*Id.* 28-29).  The ALJ found plaintiff suffered from hepatitis C, cervical degenerative disc disease, back pain, osteoarthritic changes of the left knee, and affective mood disorder.  (*Id.* 20).  The ALJ found that while these impairments were "severe" within the meaning of the regulations, they were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, of 20 C.F.R. Part 404.  (*Id.* 21).  After reviewing the medical record and discrediting plaintiff's claims in large part, the ALJ concluded plaintiff retained the residual functional capacity to perform a full range of light work, except that she was able to understand, remember, and carry-out detailed but not complex tasks.  (*Id.* 22).  Based on this residual functional capacity, the ALJ found plaintiff would not be precluded from performing her past work as a cashier.  (*Id.* 28).  Plaintiff appealed the ALJ's determination to the Appeals Council, which denied review.  (*Id.* 5).  This suit seeking federal judicial review of the denial of benefits, filed pursuant to 42 U.S.C. § 405(g) followed.

## II.
## ISSUES PRESENTED

Plaintiff presents two grounds upon which she contends reversal of the Commissioner's prior determination is warranted:

1.      The ALJ's residual functional capacity finding is not supported by substantial

evidence.

2.      The ALJ erred in finding plaintiff is capable of performing her past relevant work.

III.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989). To determine whether substantial evidence of disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence. *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Stated differently, the level of review is not *de novo*. The fact that the ALJ could have found plaintiff to be disabled is not the issue. The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ's decision and whether any errors of law were made.

IV.

<u>MERITS</u>

Plaintiff contends neither the ALJ's findings regarding her mental residual functional capacity (RFC) nor her physical RFC are supported by the substantial evidence of record.  Plaintiff further avers that had the ALJ properly limited her mental and physical RFC's he would have been unable to find plaintiff capable of returning to her past relevant work as cashier.  The Commissioner has responded that, while record evidence indicates plaintiff has some degree of limitations, there is substantial evidence in the record supporting the ALJ's determination that plaintiff's limitations are not disabling and she is able to return to her past relevant work.

The Commissioner found that, physically, plaintiff suffers from problems related to hepatitis C, degenerative disc disease, back pain, and knee pain.  Starting with the last of the four *Wren* factors, plaintiff's age, education, and work history do not, themselves, support a claim of disability. *See Wren*, 925 F.2d at 126.  At the time of the hearing before the ALJ plaintiff was a younger individual in her mid-forty's, she had a two-year associate's degree, and a work history involving both semi-skilled and unskilled jobs.  None of these factors taken alone or in conjunction with the other three *Wren* factors indicate plaintiff should be classified as disabled given her ailments. Regarding the other three *Wren* factors, the Court will analyze each element as it relates to the specific ailments from which the ALJ found plaintiff suffered.  *See id.*

*A.  The Existence of Substantial Evidence*

1.  Hepatitis C

a.  Objective Medical Evidence

Regarding objective medical evidence of her hepatitis C, the record reflects plaintiff was diagnosed with the disease in June 2007.  (Tr. 292).  Plaintiff's hepatitis C persisted for more than

six months, causing it to become classified as chronic hepatitis C.  (*Id.* 260); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.00(D)(4)(c)(I).   In December 2007, a liver biopsy was performed, which indicated no significant damage was caused to plaintiff's liver by the disease.  (Tr. 269).  It is not entirely clear from the record when plaintiff was able to obtain medication and began treatment for the disease, although it appears she began taking medication in March or April of 2008.  (*Compare* Tr. 189 (a doctor's report from December 2007 indicating the treatment was to begin in one week's time) *with id.* 332 (a doctor's report from January 2008 indicating plaintiff was, at that point, unable to obtain the medication) *and id.* 329 (a doctor's report from April 2008 indicating plaintiff had "just started treatment" of her hepatitis C) *and id.* 323 (a doctor's report from June 2008 indicating plaintiff had been on the hepatitis medication for approximately six weeks).

In June 2008, plaintiff saw Dr. Todd Ellington.  (*Id.* 323-24).  Dr. Ellington's notes indicate, "[a]fter 6-7 weeks of treatment, [Ms. Sneller's] HCV [hepatitis C virus] RNA level was undetectable."  (*Id.* 323); *see* U.S. Dept. of Veterans Affairs, *Hepatitis C RNA Quantitative Testing*, July 9, 2012, http://www.hepatitis.vs.gov/patient/diagnosis/labtests-RNA-quantitative-testing.asp (stating "[t]he quantitative HCV RNA test is used to monitor a patient who is currently on treatment. The response to treatment is considered good when the quantitative HCV RNA measurement drops and the virus eventually becomes completely undetectable.").   Additional notes found in Dr. Ellington's report from that visit are, unfortunately, not clear.  They read:

> Hepatitis C, CHRONIC WITHOUT MENTION OF HEPATIC COMA . . .
> undetectable level after 6-7 weeks
>      *Plans:*
> SUICIDE GESTURES
> now under the care of a psychiatrist.   I HAVE ADVISED SHE STOP
> TREATMENT.

(Tr. 324).  These notes are unclear whether Dr. Ellington advised plaintiff to stop her hepatitis C

treatment, as lab results apparently confirmed the virus had become undetectable, or whether he advised her to stop seeking psychiatric help. The Court suspects the former, although the ALJ assumed the latter. (*Id.* 24). In any event, approximately one month after the June 2008 visit with Dr. Ellington, plaintiff saw another doctor and did not list any hepatitis C medications as part of her "current medications." (*Id.* 334). At that visit, the doctor also listed plaintiff's hepatitis C in plaintiff's "past medical history." (*Id.*). Additionally, in 2009, plaintiff told a psychologist that her doctor had told her the hepatitis C was cured. (*Id.* 371).

### b. Diagnoses and Opinions of Treating and Examining Doctors

Regarding the diagnoses and opinions of treating and examining doctors, the record indicates plaintiff undoubtedly suffered from hepatitis C but that it had become undetectable by June 2008. (*See id.* 323-34). Of all of the doctors to treat plaintiff after that date, none of them prescribed any hepatitis C medications or made any mention of the need for further treatment of the disease. In the first two levels of disability review by the Commissioner, neither of the reviewing doctors listed hepatitis C as part of their diagnosis of plaintiff's health concerns. (*Id.* 47-48).

### c. Plaintiff's Subjective Evidence of Pain and Disability

Plaintiff's own subjective evidence of the disease, however, differs greatly from the doctors' determinations. As mentioned above, when she spoke with a psychologist, Dr. William Klienpeter, in 2009, the doctor reported, "[Ms. Sneller] said that even though Dr.'s had told her that her Hepatitis C was cured that she did not believe them and felt that it would return and basically kill her." (*Id.* 371). When plaintiff initially applied for disability benefits, she indicated hepatitis C was one of her main health problems. (*Id.* 113). In her Daily Activity Questionnaire, when asked what upsets her, plaintiff wrote, "the fact I have Hep-C it's like cancer." (*Id.* 137). At the hearing before

the ALJ, plaintiff testified her "most severe" health problem was hepatitis C. (*Id.* 37). Plaintiff stated the hepatitis C caused her constant fatigue and frequent nausea. (*Id.* 38).

> ### d. The ALJ's Determination Was Supported by Substantial Evidence

Regarding plaintiff's hepatitis C, the ALJ found,

> As for the claimant's hepatitis C, the claimant testified at her hearing that it was her most severe health problem; yet, she told Dr. Klienpeter in January 2009, that her treatment had been successful and that she was cured. Her testimony is not credible. I also note she has admitted to consuming alcohol, then denied it. Her ongoing consumption in the face of the allegation of disabling hepatitis C further erodes her credibility.

(*Id.* 27). Weighing the *Wren* factors, the Court concludes there was substantial evidence supporting the ALJ's determination. It appears that, subsequent to months of treatment, the disease became undetectable and treatment for it stopped. Plaintiff was told by her doctor she was cured of the disease. Nevertheless, plaintiff contends that she feels as though the disease continues to be her most severe health problem. Both the objective medical evidence and the diagnoses and opinions of plaintiff's treating and examining doctors contradict plaintiff's representations concerning the severity and disabling effects of the disease. It was within the ALJ's discretion to resolve this conflict, and the fact that he did not do so in plaintiff's favor is not reviewable by this Court. *See Laffoon*, 558 F.2d at 254. Rather, this Court is concerned with the existence of substantial evidence supporting that determination. Substantial evidence supporting the Commissioner's determination that plaintiff was not disabled by her hepatitis C exists in the record. *See Anderson*, 887 F.2d at 633.

> ## 2. Back, Neck, and Knee Problems

> ### a. Objective Medical Evidence

Apart from hepatitis C, plaintiff also struggles with back, neck, and knee problems. In 2005, an x-ray of plaintiff's back indicated she suffered from a "narrowing of disc space at the level of C4-

C5," which led to a diagnoses of "[d]egenerative disc disease at the level of C4-C5." (Tr. 208). Plaintiff did not undergo any treatment, and none was recommended at that time, for her back and neck problems. In March 2006, Dr. Martin Bautista evaluated plaintiff for purposes of disability determination.[1] (*Id.* 252). Dr. Bautista's report indicates plaintiff contended she was unable to continue working due to neck and back pain. (*Id.*). Dr. Bautista's physical examination of plaintiff, however, did not uncover any remarkable problems. (*Id.*). The doctor reported plaintiff had good motor strength and unremarkable gait. (*Id.*). He noted plaintiff's range of motion in the joints, spine, and hands and wrists were all enclosed. (*Id.* 253). On a "Range of Joint Motion - Evaluation Chart" Dr. Bautista completed and attached to his report, plaintiff is recorded as having full range of motion on every joint tested except for the back lateral flexion to the left where she could only extend twenty-four out of twenty-five degrees. (*Id.* 254). In all other areas tested, including her back, neck, shoulders, hands, wrists, hips, and knees, plaintiff had a full range of motion. (*Id.* 254-55). Dr. Bautista also completed a "Backsheet Lumbosacral Spine" Evaluation. (*Id.* 256). The report shows plaintiff had full range of motion in her back, despite having scoliosis. (*Id.*). The report indicates plaintiff did not suffer any lumbar pain when extending her back in various directions during the range of motion testing. (*Id.*). Plaintiff's walking and straight leg raises were normal. (*Id.*). Dr. Bautista also completed a Cervical Spine Examination of plaintiff, which again reflected a slightly decreased range of motion in plaintiff's flexion but a full range of motion on every other movement. (*Id.*). The report indicated plaintiff did suffer from cervical spine pain when moving

---

[1] The Court notes this disability evaluation, performed in 2006, was done two years *prior* to the April 2008 protective filing date in this case and over one year prior to the alleged disability onset date. (Tr. 140, 247). Plaintiff reported to a doctor in February 2006 that she was attempting to obtain disability benefits. (*Id.* 243). The record indicates plaintiff was previously denied disability benefits in May 2006. (*Id.* 110). The Court assumes the referenced 2006 exam for the purposes of disability determination was for a prior disability claim filed by plaintiff which is not presently before the Court.

her back around in completing the range of motion testing.  (*Id.*).  Lastly, Dr. Bautista completed

a hand and wrist range of motion test, which established plaintiff had a full range of motion and use

in both of her hands and wrists.  (*Id.* 257).  Dr. Bautista's evaluation appears to be the only objective

medical evidence in the record concerning plaintiff's knee.

In July 2008, a Dr. Mary Burgesser also evaluated plaintiff for the purpose of disability

determination.  (*Id.* 334).  Dr. Burgesser ordered an x-ray to be taken of plaintiff's back.  (*Id.* 336).

The x-ray revealed "[d]egenerative disc disease and osteophyte formation from C3/4-C5/6 . . . There

is slight reversal of the normal mid cervical lordosis."  (*Id.*).  The x-ray additionally showed "[m]id

thoracic dextro scoliosis."  (*Id.*).

b.  Diagnoses and Opinions of Treating and Examining Doctors

The above-discussed results of the x-ray and her own evaluation caused Dr. Burgesser to

conclude plaintiff suffered from both joint pain and muscle pain, with arthritis in her hands, knees,

back, and neck.  (*Id.* 335).  Despite these symptoms, Dr. Burgesser opined,

> the patient can sit, stand and move about, lift, handle, carry objects, hear and speak.
> She has back pain and no joint deformities, no bone or tissue destruction, loss of
> motion by degree, tenderness or heat.  She can heel-toe walk, hop, squat and tandem
> walk.  She can reach, handle, finger and feel.  She has normal grip strength.

(*Id.*).

Approximately one week after Dr. Burgesser's evaluation and the x-ray, Dr. Randal Reid,

a state agency doctor, completed a Physical Residual Functional Capacity assessment on plaintiff.

(*Id.* 356).  According to Dr. Reid, plaintiff was capable of occasionally lifting up to fifty pounds and

frequently lifting up to twenty-five pounds.  (*Id.* 357).  She could stand and sit for six hours a day.

(*Id.*).  She was not limited in pushing or pulling activities.  (*Id.*).  Dr. Reid, taking into consideration

plaintiff's "described pain and objective findings of Cspine degenerative changes," imposed

occasional postural limitations on plaintiff. (*Id.* 358). Regarding manipulative limitations, Dr. Reid, again taking the degenerative changes of plaintiff's cervical spine into consideration, limited plaintiff's reaching, but indicated plaintiff was unlimited in all other areas of manipulations. (*Id.* 359). No visual, communicative, or environmental limitations were imposed. (*Id.* 359-60). Dr. Reid indicated that although plaintiff complained of significant atralgias and myalgias,[2] she nevertheless had a history of normal results in range of movement, strength, and sensory exams. (*Id.* 363). Dr. Reid concluded plaintiff's "[a]llegations are only partially credible when compared to the [evidence of record]." (*Id.*). That same day, Dr. Reid completed the first determination of not disabled. (*Id.* 47). Doctor Mary Hernandez, working as a state agency doctor, reached the same conclusion when she reviewed plaintiff's records after the initial denial. (*Id.* 48).

### c.  Plaintiff's Subjective Evidence of Pain and Disability

In 2005, plaintiff complained of pain in her cervical spine and numbness in both arms. (*Id.* 202). She worked, however, in 2003, 2004, and 2005, as a cashier and from November 2006 to December 2007 as a meat cutter. (*Id.* 114). In 2006, when she was seen for a bad reaction to methamphetamine, plaintiff told the doctor she suffered from occasional low back pain and neck pain. (*Id.* 239). At that time, she told the doctor she took cocaine because "cocaine [is] cheaper than pain killers," indicating plaintiff was potentially suffering from some degree of pain. (*Id.*). Plaintiff again complained of back and neck problems the following month, which was March 2008, when she was being evaluated for disability benefits. (*Id.* 249). In May 2008, when she was admitted to the hospital for a suicide attempt, plaintiff indicated her whole body was in severe pain. (*Id.* 305). The next report of plaintiff's back pain is in July 2008, when Dr. Burgesser was evaluating her for disability purposes. (*Id.* 334). There is only one medical report, dated April 8, 2011, in the medical

---

[2]  Atralgias is pain of the joints, and myalgias is pain of the muscles.  *Dorland's Medical Dictionary*.

record where plaintiff complained of knee pain. (*Id.* 178). There are no medical reports of plaintiff complaining of or seeking treatment for knee pain until that point, although Dr. Burgesser did reference arthritis in plaintiff's hands, knees, back, and neck.

When plaintiff filed her disability application in April 2008, she indicated bulging discs in her neck caused her constant pain. (*Id.* 113). In her daily activity questionnaire, plaintiff indicated her problems limited every single area of her daily activities. (*Id.* 132). In the disability reports she completed on appeal, plaintiff stated, "[m]ost of the time I can't move. I am stiff from head to toe . . . I have migraines all the time." (*Id.* 168). She later indicated her back and neck problems made it difficult for her to sleep. (*Id.* 149). In line with her prior reports, at the ALJ hearing plaintiff described her neck pain as a constant burning sensation that never subsides. (*Id.* 40). Plaintiff indicated her neck problems caused her to have headaches and was affecting her "shoulders, arms, and upper part and down to [her] hands." (*Id.* at 39). Regarding her knee, plaintiff testified it was very difficult to climb because her knee buckles on her and she sometimes falls. (*Id.* 40). Plaintiff testified, "[t]he knee, that comes and goes, depending on the weather." (*Id.*).

d. The ALJ's Determination Was Supported by Substantial Evidence

Regarding plaintiff's back/neck and knee problems, the ALJ found,

> despite the claimant's complaints of neck pain and knee pain, she has not sought or received any medical treatment for these conditions. In fact, the medical evidence reveals that the claimant has not received any medical treatment outside the realm of her consultative examinations . . . Further, there is no diagnostic evidence of an abnormality that would cause disabling back pain.

(*Id.* 27). Weighing the *Wren* factors, the Court concludes there was substantial evidence supporting the ALJ's determination. 925 F.2d at 126. The objective medical evidence indicates plaintiff does suffer from a medically determinable problem in her cervical spine/neck. Doctors who knew of the x-ray results and conditions from which plaintiff suffers concluded that the back/neck problems were

not disabling.  Additionally, the record contains very little evidence regarding plaintiff's knee, as she apparently did not go to any doctor for a diagnosis of it nor for treatment of it until April 2011, which was more than three years after the alleged disability onset date.  (Tr. 178).

Plaintiff contended her musculoskeletal problems and the pain caused by them, were disabling.  Pain can constitute a disabling impairment.  *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  However, pain is disabling only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).  By itself, the fact that a plaintiff may suffer some pain while working is not enough to support a finding of disability.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  Rather, "[p]laintiff must show that [she] is so functionally impaired that [she] is precluded from engaging in substantial gainful activity."  *Id.* (citations omitted).  In determining whether pain is disabling, "the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints."  *Falco*, 27 F.3d at 163.  The decision whether plaintiff's pain is disabling rests soundly within the discretion of the ALJ.  *Hollis v. Bowen*, 837 F.2d 1378, 1387 (5th Cir. 1988).

The ALJ found plaintiff's "subjective complaints of pain are out of proportion to the objective medical evidence." (Tr. 26).  He additionally concluded, "[a]lso her statements concerning her impairments and their impact on her ability to work are considerably more limited and restricted than what is established by the medical evidence, her own contemporaneous statements to treating sources, and medical source opinions."  (*Id.*).  The Court finds there is substantial evidence in the record supporting this determination.  Many of plaintiff's complaints of pain and disability are sporadic; plaintiff has failed to actively and consistently seek medical treatment to the degree expected of a person suffering from "constant, unremitting" pain.  *See Selders*, 914 F.2d at 618-19; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (the fact that disability claimant did not

routinely seek treatment for pain can be evidence discounting its disabling nature); 20 C.F.R. § 416.930; 61 F.R. 34483-01, 34486 (1996). The conditions of which plaintiff has consistently complained appear to not be disabling since plaintiff has continued working for many years after first alleging any problems. *See* 61 F.R. at 34486 (requiring the ALJ to consider, among other things, the internal consistency of a claimant's statements when evaluating the claimant's credibility). It was within the ALJ's discretion to accept the objective medical evidence and opinions of treating and examining physicians over plaintiff's subjective complaints. *See Laffoon*, 558 F.2d at 254. The ALJ's enunciated reasons for denying plaintiff benefits despite her complaints of pain and disability in her cervical spine/neck and knee are supported by substantial evidence in the record. *See Anderson*, 887 F.2d at 633.

### 3.   Mental Health Problems

Plaintiff also suffers from depression and has sporadically been diagnosed with anxiety and panic disorders. (Tr. 219, 222, 250). She suffers from suicidal thoughts and has, in fact, attempted suicide on more than one occasion. (*Id.* 187, 249, 297, 324). Plaintiff also has a history of illegal drug use. When she was forty years old, which would have been approximately in 2002, plaintiff checked herself into a rehabilitation clinic based upon cocaine use. (*Id.* 314). In February 2006, plaintiff was hospitalized after using methamphetamine, which caused her to have delusions and hallucinations. (*Id.* 230). At that time, the doctor noted plaintiff had needle tracks on both forearms. (*Id.* 238). The doctor's notes reflect plaintiff admitted to having a history of abusing alcohol, marijuana, cocaine/crack, amphetamines, and methamphetamines. (*Id.* 241). In May 2008, when she was admitted to the hospital following a failed suicide attempt, plaintiff indicated her last methamphetamine use was five years ago (when the medical record indicates it was at least two years prior to that day) and her last cocaine use was three weeks ago. (*Id.* 302). During a

psychological evaluation later that month (in May 2008), however, the doctor noted plaintiff "reported using drugs for approximately one year when she was forty. She denied current alcohol or drug use." (*Id.* 316). In July 2008, plaintiff again denied any drug use. (*Id.* 334). Finally, in a 2009 psychological evaluation, plaintiff told her doctor she had last used methamphetamine and cocaine in 2003. (*Id.* 375).

### a. Objective Medical Evidence

Objective medical evidence of psychiatric problems are medically demonstrable phenomena that indicate specific psychological abnormalities, i.e., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. 20 C.F.R. § 416.928(b). They must be shown by observable facts that can be medically described and evaluated. *Id.* § 416.928(c).

The medical record indicates plaintiff has long struggled with major depressive disorder. (Tr. 214, 219, 222, 231). In 2006, plaintiff was evaluated by Dr. Richard Kahoe, a licensed psychologist. Dr. Kahoe observed plaintiff's gait and posture were normal but that her motor behavior "was marked by slow, retarded movements." (*Id.* 247). Plaintiff's mood was depressed, but her affect was appropriate . (*Id.* 248). Dr. Kahoe observed signs of anxiety during the interview. (*Id.*). Plaintiff's thought processes were "logical and coherent." (*Id.*). Dr. Kahoe described plaintiff as having deficits in her recent memory. (*Id.*). Plaintiff was oriented for person, place, and time. (*Id.*). Her intellectual ability was estimated as being average, "with indications of a mild decline in intellectual functioning." (*Id.*). Her abstract thinking abilities were assessed as "somewhat impaired," but her computational thinking abilities were "within normal limits." (*Id.* 248-49).

In 2008, plaintiff was seen by clinical psychologist Dr. William Klienpeter for the purposes of disability determination. (*Id.* 313). Dr. Klienpeter noted plaintiff's gait was normal and her gross motor coordination was "unremarkable." (*Id.*). Dr. Klienpeter's mental status examination of

plaintiff revealed few abnormalities of behavior: plaintiff maintained good eye contact; fully answered questions asked of her; and spoke in complete and complex sentences.  (*Id.* 317).  However, she appeared restless, fidgety, and mildly agitated; at times her speech was rapid and clipped. (*Id.*).  Plaintiff's mood was "significantly depressed.  She appeared tense, agitated and very sad." (*Id.* 318).  Plaintiff's thoughts were "rational and goal-directed." (*Id.* 317).  "[T]here were no indications of special preoccupations, delusional or paranoid thinking." (*Id.* 318).  The examination revealed plaintiff's remote memory was "adequate," and her concentration was "below average." (*Id.* 318-19).  She was oriented as to person, place, and time. (*Id.* 318).  Plaintiff's fund of general information was assessed to be within the high-average range. (*Id.*).  Her judgment and insight were "fair." (*Id.* 319).

In 2009, plaintiff was again evaluated by Dr. Klienpeter for purposes of disability determination. (*Id.* 370).  Dr. Klienpeter again observed plaintiff's gait was normal and her "[g]ross motor coordination was unremarkable." (*Id.*).  The mental status exam Dr. Klienpeter administered to plaintiff indicated plaintiff had no abnormalities of behavior. (*Id.* 376).  Her mood was depressed and irritable, but plaintiff "did not appear agitated or significantly anxious." (*Id.* 377).  "Her thoughts were rational and goal-directed.  No circumstantial or tangential qualities were noted or looseness of associations." (*Id.* 376).  There was likewise "no evidence of special preoccupations, delusional or paranoid thinking." (*Id.*).  The test revealed plaintiff's remote memory was "adequate," her short-term memory was "within the average range," and her concentration level was "average." (*Id.* 378).  "She did not appear to have difficulty with distractibility or inattention." (*Id.*).  Plaintiff was oriented as to person, place, and time, and her fund of general information was again assessed within the high-average range. (*Id.* 377).  Plaintiff's judgment "was adequate;" her "[i]nsight was fair." (*Id.* 378).

b.  Diagnoses and Opinions of Treating and Examining Doctors

As a result of his 2006 evaluation of plaintiff, Dr. Kahoe diagnosed plaintiff with the mental health issues of major depressive disorder and panic disorder.  (*Id.* 250).  Dr. Kahoe stated, "the claimant's personality appears to be best characterized as aggressive, paranoid, explosive, depressive, and anxious." (*Id.*).  He concluded plaintiff suffered from the mental health problems of major depressive disorder, recurrent and severe; panic disorder with mild agoraphobia; and dependent personality disorder.  (*Id.*).  Dr. Kahoe indicated "[t]he prognosis for change with appropriate treatment is considered to be fair." (*Id.*).

As a result of his May 2008 examination, Dr. William Klienpeter also diagnosed plaintiff with major depressive disorder, recurrent and severe.  (*Id.* 319).  In his report, Dr. Klienpeter opined, "Ms. Sneller's agitated depression would make it difficult for her [to] reliably complete work-like tasks." (*Id.* 316).  Based upon plaintiff's interview with Dr. Kleinpeter, Dr. Leela Reddy, who is a state agency doctor, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment on plaintiff in July 2008.  (*Id.* 338-55).  In the Psychiatric Review Technique, Dr. Reddy indicated plaintiff suffers from "MDD," which is presumably major depressive disorder.  (*Id.* 341).  Consequently, Dr. Reddy concluded, plaintiff suffered from moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace.  (*Id.* 348).  She further concluded, "claimant is somewhat limited by her [symptoms] but [that] does not compromise her ability to do simple work." (*Id.* 350).

In conjunction with her Psychiatric Review Technique, Dr. Reddy also completed a Mental Residual Functional Capacity assessment of plaintiff.  Dr. Reddy indicated plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (*Id.* 352).  She indicated plaintiff is moderately limited in her ability to maintain attention and concentration for

extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (*Id.* 352-53).  Dr. Reddy's functional capacity assessment was that plaintiff "can understand, remember, and carry out simple instructions, [make] simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors and respond appropriately to changes in routine work setting."  (*Id.* 354).

In January 2009, when plaintiff returned to Dr. Klienpeter for another psychological evaluation, her chief complaints were of depression and anger.  (*Id.* 371).  Plaintiff told Dr. Klienpeter "she was currently not able to work because of poor energy, feelings of hopelessness [sic], irritability, sadness and no motivation."  (*Id.* 372).  Plaintiff reported seeing a counselor in 2003, but indicated she had stopped the sessions because she did not feel the therapy was helpful. (*Id.*).  She said she was prescribed Effexor,[3] but that "she did not like the way the medications made her feel and was currently taking no medication."  (*Id.*).  Dr. Klienpeter indicated plaintiff's exam "suggested no problems with memory, comprehension or abstract reasoning.  Factors impacting Ms. Sneller's inability to work include her lack of motivation.  In addition, she commented that in her small community there was only one place to get a job, the beef packing plant where she did not

---

[3] Effexor is a medication used to treat major depressive disorder.  *Physicians' Desk Reference*, 3021 (2012).

want to work." (*Id.* 374).  Dr. Klienpeter also reported Ms. Sneller's concentration was "average," and she "did not appear to have difficulty with distractability or inattention." (*Id.* 378).  The doctor diagnosed plaintiff with major depressive disorder, recurrent and moderate.  (*Id.*).  He did not, however, issue any opinion as to plaintiff's ability to complete work-like tasks, as he had done at the conclusion of his 2008 evaluation.

In the following month, February 2009, Dr. Robert Gilliland completed another Psychiatric Review Technique and Mental Residual Functional Capacity assessment of plaintiff.  Dr. Gilliland, like Dr. Reddy before him, indicated plaintiff suffered from recurrent major depressive disorder. (*Id.* 341, 385).  Dr. Gilliland also found plaintiff's mental health problems caused her to suffer from moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (*Id.* 392).  Where Dr. Reddy indicated plaintiff's mental health problems only mildly restricted her activities of daily living, Dr. Gilliland indicated plaintiff's activities of daily living were moderately restricted.  (*Id.* 348, 392).

Dr. Gilliland's Mental Residual Functional Capacity assessment of plaintiff differed in many ways from Dr. Reddy's.  Dr. Reddy indicated plaintiff was "markedly limited" in her ability to understand, remember, and carry out detailed instructions but  Dr. Gilliland concluded plaintiff was only "moderately limited" in these areas.  (*Id.* 352, 396).  Dr. Reddy opined plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; ask simple questions or request assistance; get along with coworkers; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals.  (*Id.* 352-53).  Dr. Gilliland, on the other hand, concluded plaintiff was not significantly limited in any of these areas.  (*Id.* 396-97).  Dr. Gilliland agreed with Dr. Reddy that

plaintiff was moderately limited in her ability to complete a normal workday and work week; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (*Id.* 353, 397). He also agreed with Dr. Reddy that plaintiff was not significantly limited in her ability to be aware of normal hazards, take normal and appropriate precautions, and travel in unfamiliar places. (*Id.*).

c.  Plaintiff's Subjective Evidence of Disability

At her 2008 visit with Dr. Klienpeter, plaintiff indicated her activities of daily living were that she would get up at 6:00 a.m., fix coffee, clean dishes, and watch television. "She may do some housework and garden.  She prepares simple meals.  If groceries are needed, she goes with her fiancé." (*Id.* 315).  Plaintiff indicated that she did not like to be around people.  (*Id.*).

At her 2009 visit with Dr. Klienpeter, plaintiff stated she got up between 8:00 and 9:00 a.m., smoked cigarettes, and drank coffee; after that, she might take a nap. (*Id.* 373).  "She cleans about once a week.  Her fiancé brings fast food home for lunch and supper.  She may cook about once a month. She goes to the grocery store on occasion.  She watches TV sometimes." (*Id.*).  She told Dr. Klienpeter that she previously enjoyed gardening but she no longer had the energy or interest to engage in such a hobby.  (*Id.*).

Apart from plaintiff's reports to her doctors, plaintiff has represented that her psychological problems are disabling.  The medical record, which goes back to 2002, indicates plaintiff has consistently complained of depression, although when she initially filed for disability, plaintiff failed to list depression or any other psychological problem as an "illness[], injur[y], or condition that limit[s] her ability to work." (*Id.* 113).  Later, in the same report, however, plaintiff indicated she had "lived with depression since I was a child," and had "struggled to be part of everyday life to mix & mingle with public." (*Id.* 122).

In her Daily Activity Questionnaire relating to the disabling nature of her mental problems, plaintiff indicated that sleeping is what she does on an average day. (*Id.* 135). She represented she did not tend to her personal needs and rarely cooked, shopped, or did any household chores. (*Id.*). She said she had difficulty remembering to do things because, "I forget and don't care to do it." (*Id.* 136). Plaintiff indicated she avoids everybody and, generally, "do[esn't] want to be bothered for anything." (*Id.*). At the hearing before the ALJ, plaintiff testified her depression was the least disabling of her medical conditions. (*Id.* 38). She stated she was, "always depressed," and her depression caused her to not have any "good days." (*Id.* 40).

d. The ALJ's Determination Was Supported by Substantial Evidence

The ALJ recognized that plaintiff "has a long history of treatment for depression." (*Id.* 26). The ALJ discounted plaintiff's widely varied GAF scores and discredited Dr. Klienpeter, stating,

> I considered the medical opinions of Dr. Klienpeter, specifically his opinion that the claimant's "depression would make it difficult for her to reliably complete work-like tasks." At his second evaluation with the claimant, Dr. Klienpeter did not report any opinion as to the claimant's ability to work. I find Dr. Klienpeter's opinion is inconsistent with medical evidence as a whole, as well as the claimant's statements to him, and her stated ability to adequately perform various daily activities. Dr. Klienpeter also failed to recognize the claimant's blatant inconsistency with regard to her drug use. Additionally, at the second evaluation the claimant had no difficulty in adding serial 3's, unlike her first examination, and her concentration had improved from below average to average; therefore Dr. Klienpeter assessed her with a higher GAF. I do not find the statements or opinions of Dr. Klienpeter to be controlling, but I have considered them in conjunction with the remaining credible evidence in reaching my conclusion

(*Id.* 26-27). This portion of the determination is, unfortunately, lacking clarity. For example, when the ALJ says he does not find the "statements or opinions of Dr. Klienpeter to be controlling," it is unclear whether he intends to reference all of Dr. Klienpeter's statements (from both his 2008 and 2009 examinations) or just the statements from his first examination in 2008 when he indicated plaintiff's depression would "make it difficult for her to reliably complete work-like tasks." The

ALJ finds "Dr. Klienpeter's opinion is inconsistent with medical evidence as a whole," but fails to indicate whether he is discrediting the 2008 opinion (indicating plaintiff could have difficulty completing work-like tasks) or the 2009 opinion (indicating plaintiff had no problem with memory, comprehension, or reasoning and withholding any opinion on plaintiff's ability to complete work-like tasks).   Dr. Klienpeter's failure to recognize plaintiff's "blatant inconsistency" regarding her drug use could not have possibly come up at the 2008 evaluation.   It was at the 2009 evaluation that plaintiff gave Dr. Klienpeter a different story about her last use date than she had given at the 2008 evaluation.   It is possible to conclude the ALJ meant to discredit all of Dr. Klienpeter's reports, but for the fact that the ALJ later gave more weight to Dr. Gilliland's Mental RFC assessment than to Dr. Reddy's assessment because Dr. Gilliland's assessment was "consistent with the objective findings of Dr. Klienpeter's second examination." (*Id.* 28).   The Court is left questioning the weight the ALJ gave to each of Dr. Klienpeter's reports.   In any event, the point is not determinative because the reports of Drs. Kahoe, Gilliland, and Reddy are also in the record indicating plaintiff was not disabled due to her mental condition.   In addition, plaintiff has failed to raise any argument stemming from the ambiguity in the ALJ's handling of Dr. Klienpeter's opinions.   Moreover, the Court knows the ALJ favorably relied upon the other physicians reports because he said in his determination, "I do concur with the State Agency's finding that the claimant's mental impairments are severe, but not disabling." (*Id.* 27).   He also rejected plaintiff's subjective complaints, holding she was "not generally credible." (*Id.*).   Apart from the confusing discussion of Dr. Klienpeter's reports, the ALJ did not specifically dedicate a significant portion of his determination to all of plaintiff's mental ailments.   Rather, he appears to have included those problems with his overall conclusion:

> I have considered the administrative findings of fact made by the State Agency

medical physicians . . . These opinions are weighed as statements from non-examining sources.  I disagree with the State Agency examiners finding that the claimant is capable of a reduced range of medium work.  I find that, given the updated medical evidence, the claimant is more limited than previously assessed.  While the evidence does not entirely support the claimant's extensive complaints, some level of pain and functional loss could reasonably be expected as a result of her impairments.  Accordingly, the State Agency opinions are granted little evidentiary weight in determining the claimant's physical functional abilities.  I do concur with the State Agency's finding that the claimant's mental impairments are severe, but not disabling.  There is no medical opinion from any medical source indicating that the claimant is entirely incapable of working.

(*Id.*).  The evidence necessary to support the ALJ's decision need not be by a preponderance.  It need only be enough to support the decision and there is substantial evidence in the record to support this determination.  While there is ample evidence of plaintiff's ongoing struggle with depression, a struggle she has been engaged in since childhood, none of the objective medical evidence indicates plaintiff's depression is disabling.  Regarding doctors' opinions, in 2006, Dr. Kahoe diagnosed plaintiff with major depressive disorder and panic disorder, but also indicated plaintiff's prognosis for change was fair.  (*Id.* 250).  Neither Dr. Klienpeter's 2008 or 2009 opinions indicated plaintiff was totally disabled, regardless of the weight the ALJ afforded either one of them.  Although she made specific findings of limitation, Dr. Reddy concluded plaintiff's ability to perform simple work was not compromised by her mental health issues.  (*Id.* 350).  The other state agency doctor to evaluate plaintiff's mental health record, Dr. Gilliland, concluded plaintiff's mental conditions were even less disabling than Dr. Reddy found them to be.  (*Id.* 396-97).  Thus, in addition to the objective medical evidence, the opinions of treating and examining physicians also support the conclusion that plaintiff's conditions are not disabling.  *See Wren*, 925 F.2d at 126.

In contrast to the objective medical evidence and the majority of the doctors' opinions, plaintiff appeared to contend (at least at the hearing before the ALJ) that her depression was

disabling, although plaintiff herself described it as her least disabling ailment.  The ALJ considered

plaintiff's testimony and compared it to the objective medical evidence and the accepted doctors'

opinions, as well as to other statements by plaintiff in her reports of activities of daily living.

Plaintiff stated she had struggled with depression her whole life, but the record indicated she was

able to work while suffering from such depression.   Plaintiff testified that, as a result of her

depression, she never had any good days.  Her reports to the examining doctor, however, indicate

her daily actives were not as limited as she represented them to be.  In sum, the ALJ's discrediting

of plaintiff's allegations that her depression was disabling was within his discretion and was

supported by substantial evidence in the record.  *See id.*

### B.  The Residual Functional Capacity Finding

The ALJ's residual functional capacity determination was that plaintiff was able to "perform

the full range of light work . . . except she was able to understand, remember, and carry-out [sic]

detailed, but not complex tasks."  (Tr. 22).

Light work is defined by the Social Security Administration as follows:

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds.  Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or standing, or when
it involves sitting most of the time with some pushing and pulling of arm or leg
controls.  To be considered capable of performing a full or wide range of light work,
you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.2567(b).

Plaintiff contends the ALJ's residual functional capacity was not supported by substantial

evidence of record.  As detailed above, however both treating and examining physicians indicated

plaintiff was able to meet the listed requirements of "light" work.  (Tr. 47, 48, 252, 334, 356).

Specifically, Dr. Burgesser did not limit plaintiff's work activities after reviewing plaintiff's

musculoskeletal problems.  (*Id.* 335).  Dr. Reid concluded plaintiff was capable of occasionally lifting 50 pounds, frequently lifting 25 pounds, standing, walking, and/or sitting for about six hours in an eight-hour workday.  (*Id.* 357).  Dr. Reid imposed occasional postural limitations on plaintiff, "in affirmation of claimant[']s described pain and objective findings of Cspine degenerative changes."  (*Id.* 358).  He indicated plaintiff's reaching in all directions was limited to occasional, again taking into consideration plaintiff's "Cspine degenerative changes and cervical, scapular muscle pain."  (*Id.* 359).  Dr. Reid found plaintiff had not established any other limitations.  (*Id.* 360-63).  In sum, Dr. Reid found plaintiff could perform "medium" level work.  20 C.F.R. § 404.1567(c).  The ALJ recognized this determination but "limited [plaintiff] to light work, giving her the benefit of every doubt as to her musculoskeletal impairments."  (Tr. 27).

Regarding plaintiff's ability to perform light work despite her psychological illnesses, as detailed above, the objective medical evidence did not indicate plaintiff was disabled due to her depression.  Moreover, doctors reviewing plaintiff's claim and mental health treatment reports concluded that even though plaintiff suffers from depression, she remains able to work.

### C.  The Finding that Plaintiff is Able to Return to Her Past Relevant Work

Plaintiff additionally contends the Commissioner erred in determining she was able to return to her past relevant work as a cashier.  At the hearing before the ALJ, a vocational expert (VE) testified.  He indicated plaintiff's past relevant work included cashier, which is classified as a light, unskilled job; a meat trimmer, classified as a medium, unskilled job; and a cook's helper, classified as a medium, unskilled job.  (Tr. 42).  The ALJ asked the VE, "[w]hat if one could understand, remember, and carry out detailed, but not complex tasks?  Could she perform any of those jobs?"  (*Id.*).  The VE indicated a person could work all three of the listed jobs with such a limitation.  (*Id.*).  The ALJ then further limited the person's ability to only complete light work, at which point the VE

indicated such a person would be able to work as a cashier. (*Id.*). The ALJ asked, "due to fatigue, if she could not work an eight-hour workday on a sustained basis, could she work any of those jobs," to which the VE indicated she could not. (*Id.*). On cross-examination, plaintiff's attorney asked the VE if a person with one unexcused absence per week was capable of sustaining employment. (*Id.* 43). The VE indicated more than one to two unexcused absences a month would not be tolerated by most employers. (*Id.*).

Plaintiff's attorney then referred the VE to Exhibit 15F, which is Dr. Reddy's Mental Residual Functional Capacity assessment, discussed above. The VE indicated "[t]he moderate limitations, it could have an effect on some of the jobs, but it wouldn't preclude working, on the ones that I have looked at." (*Id.* 44). The VE did indicate, however, that plaintiff's past work as a cashier involved dealing with the public and consequently stated, "[s]o, that would be a problem with that job. It could be some problems with working with coworkers, if they are not getting along with the public." (*Id.*).

Plaintiff complains that the ALJ did not specifically discuss the impact of plaintiff's limited ability to interact with the public on her ability to maintain and retain employment as a cashier, which is a position dealing a great deal with the public. In his determination, the ALJ discussed the VE's testimony during cross-examination. The ALJ stated that while plaintiff's counsel relied upon exhibit 15F, the ALJ "[found] more weight should be given to Exhibit 22F because it is consistent with the objective findings of Dr. Kilenpeter's second examination." (*Id.* 28). Exhibit 15F is Dr. Reddy's Mental RFC Assessment, and 22F is Dr. Gilliland's Mental RFC Assessment. (*Id.* 396). While Dr. Gilliland's assessment did not limit plaintiff in as many areas as Dr. Reddy's assessment, both assessments concluded plaintiff was moderately limited in her ability to interact appropriately

with the general public.  (*Id.* 353, 397).  Plaintiff has not shown a moderate limitation would, by definition, eliminate the cashier job, and has failed to demonstrate why the ALJ's failure to discuss plaintiff's moderate limitation in dealing with the public was reversible error.  *Cantrell v. McMahon*, 227 Fed.Appx. 321, 322 (5th Cir.2007) (per curiam) (upholding the ALJ's definition of moderate—"there are some moderate limitations, but the person can still perform the task satisfactorily"—as not inconsistent with the regulations).  At that point in the proceedings, i.e. step four, the burden was still upon plaintiff to prove she was incapable of performing any of her past relevant work.  *See Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).  That the ALJ did not delve into a moderate limitation does not constitute reversible error on the ALJ's part in finding plaintiff capable of returning to her past relevant work.

The abbreviated manner by which the plaintiff's depression issues were addressed is not the preferred approach.  The ALJ should have made more detailed findings explaining exactly how he reached his ultimate conclusion.  However, the ALJ's failure to do so is not reversible.  Although the ALJ did not specifically cite the pertinent evidence and explain how he reached his finding, there was evidence in the record to support his finding.

For the reasons detailed above, substantial evidence supports the ALJ's RFC determination.  The result of that RFC determination, that plaintiff could return to her past relevant work as a cashier, is supported by the substantial evidence.  *See Wren*, 925 F.2d at 126.

V.

RECOMMENDATION

For all of the reasons set forth above, it is the opinion and recommendation of the undersigned to the United States District Judge that the decision of the Commissioner finding

plaintiff MARLENE CORTEZ SNELLER not disabled and not entitled to disability benefits be

AFFIRMED.

VI.

INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 6th day of March, 2013.


_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE


**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).